## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JASON C. TURK,

      Plaintiff,

v.                                 Case No: 8:18-cv-2490-CEH-TGW

BRIAN CRYTZER and VINCENT
PAGLIARO,

      Defendants.

_____/

### O R D E R

This matter comes before the Court upon Defendants' Motion for Summary Judgment [Doc. 58], Plaintiff's Response Opposing Summary Judgment Motion [Doc. 62], Defendants' Reply in Support of Summary Judgment [Doc. 67], and the Stipulation of Undisputed Material Facts [Doc. 66]. In the motion, Defendants state that there is no issue of fact that they are entitled to qualified immunity. The Court, having considered the parties' submissions, including trial and deposition transcripts, declarations, a DVD, and being fully advised in the premises will **GRANT** Defendants' Motion for Summary Judgment.

### I.    BACKGROUND

*Undisputed Material Facts*[1]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the Statement of Agreed Material Facts [Doc. 66], testimony from Plaintiff Jason Turk and his wife Amanda Turk, as well as testimony from

As of October 7, 2014, Plaintiff Jason Turk received his primary care treatment at the James Haley Veterans Affairs Hospital. [Doc. 66 ¶ 1]. At the time, Dr. Sam Mikhail served as Turk's primary care physician and was responsible for managing Plaintiff's pain medications. *Id.* ¶ 2. On October 7, 2014, at Dr. Mikhail's direction, Turk presented at the James Haley emergency room to obtain pain medication. *Id.* ¶ 3. He was accompanied by his wife, Amanda Turk, and their two-year-old daughter. *Id.* ¶ 4. The doctor Turk saw directed him to the Primary Care Annex ("PCA") to obtain pain medication. *Id.* ¶ 5. Upon arriving at the PCA, Turk proceeded to Bravo Company—the section of the PCA that handled his primary care. *Id.* ¶ 6.

After a short wait, Turk and his wife were seen by Dr. Emad Ibrahim. *Id.* ¶ 7. Turk and Dr. Ibrahim disagreed about the appropriate dosage of pain medication that Turk should be prescribed. [Doc. 58-2 at p. 98: l. 14 – 100: l. 9].[2] During this disagreement Turk became upset and began speaking in a loud voice. *Id.* at p. 61: l. 16 – l. 25;[3] Doc. 58-5[4] at p. 7: l. 10 – l. 18. At some point during Turk's visit, Dr. Ibrahim

---

Defendants Officer Brian Crytzer and Officer Vincent Pagliaro, and the DVD provided by Turk [Doc. 64].

[2] Doc. 58-2, titled Exhibit B, contains trial testimony from Turk's criminal case, *State of Florida v. Turk*, Case No. 14-CF-014649-A (Fla. 13th Jud. Cir. June 8, 2016). The parties have cited to testimony from both Mr. Turk and his wife. The reference here is to testimony from Turk. While neither side has raised an issue as to the Court's ability to consider testimony from Turk's related criminal trial, the Court notes that such testimony can be considered on a motion for summary judgment. *Fuqua v. Turner*, 996 F.3d 1140, 1148 (11th Cir. 2021) (holding that district court's reliance on suppression hearing transcript in considering officer's motion for summary judgment on Fuqua's 42 U.S.C. § 1983 Fourth Amendment violation claim was proper). "[T]estimony in a judicial proceeding [is regarded] as functionally equivalent to deposition testimony since it is given under oath and with the opportunity for cross-examination." *Id.*

[3] Trial Testimony of Amanda Turk in criminal case.

[4] Deposition of Dr. Emad Ibrahim in criminal case.

left the patient room to review Turk's chart, consult with his supervisor about how to handle the situation, and allow Turk time to calm down. [Doc. 58-5 at p. 24: l. 1 – l. 17; Doc. 58-2 at p. 63: l. 14-21]. Upon returning to the patient room, Dr. Ibrahim continued speaking to Turk, who remained adamant about the dosage he needed and refused to calm down. [Doc. 58-5 at pp. 23: l. 22 - 24: l. 4]. Because of this, Dr. Ibrahim asked Ms. Turk to leave the room. *Id.* at pp. 23: l. 24 – 24: l. 4.

Turk described that encounter as follows:

> And so [Dr. Ibrahim] comes back in about a minute later. And he says -- he says, well, no, I can't give you 30 milligrams. He says I can give you 20 milligrams a day, so 10 in the morning, 10 in the afternoon. And I said, doc, that's not even going to touch my pain. And I said that extra five milligrams really helps with the pain. He says, well, you can take it or leave it, you know, either take the 20 milligrams or you can go back to the ER and get nothing.
>
> And I looked at him and I go what the fuck, you know, like, what are you talking about. And so I pulled my phone out and I said, you know, this is why I fucking need this medication. And I pulled up the picture. And I kind of shove it in his face. And I'm like this is why. And I show him a picture of my jaw just blown off. And he just kind of looks at it. And says, Ms. Turk, I need you to leave the room.

[Doc. 58-2 at p. 99: l. 9 – l. 25]. After Amanda Turk left, Dr. Ibrahim continued speaking with Turk in the hopes that he would calm down, but Turk did not calm down and continued to shove the picture of his gunshot wound in Dr. Ibrahim's face. [Doc. 58-5 at p. 23: l. 11 – l. 16]. At that point, Dr. Ibrahim triggered a silent panic alarm notifying the VA police that he needed assistance. *Id.*; Doc. 66 ¶ 10. Just over a minute later, Dr. Ibrahim triggered the panic alarm a second time. [Doc. 66 ¶ 11].

3

Between 3:22 pm and 3:25 pm, five separate panic alarms were triggered from inside the Bravo Company.[5] [Doc. 58-6].

Defendants, VA Patrol Officers Bryan Crytzer and Vincent Pagliaro, responded to the alarms. [Doc. 66 ¶ 12]. After arriving in the Bravo Company Cubicle Room, Officer Pagliaro heard shouting and cursing coming from one of the patient rooms. [Doc. 58-9 ¶ 12].[6] He also observed a group of VA employees huddled together near the patient room from which the shouting was coming. They were not working and appeared to be distracted by the commotion. *Id.* ¶¶ 13, 14.  As Officer Pagliaro and Officer Crytzer approached the patient room that was the source of the shouting, one of the VA employees commented that Defendants needed to get into the room because something bad was going on. *Id.* However, Officer Pagliaro did not ask any questions of the nurses or medical staff there. [Doc. 58-1 at p. 132: l. 13 -l. 22]. After the door to Turk's patient room was opened, Defendants saw Turk seated and the doctor near his computer. [Doc. 66 ¶¶ 12, 13]. At that time, the doctor was not crying, shouting, screaming, yelling, or running out of the room. *Id.* ¶ 13. Additionally, the doctor did not say why he had pressed the alarm, nor was he asked. [Doc. 58-1 at p. 133: l. 16 – l. 25].

Sometime thereafter, Amanda Turk entered the room. *Id.* ¶ 14. Defendants had not previously met Turk or his wife, so at the time, they were unaware that Turk was

---

[5] Two of these alarms were triggered by a nurse, Shirley George, and another was triggered by an unidentified person.
[6] This is identified as Exhibit I and is a declaration from Officer Pagliaro.

related to her. [Doc. 58-9 ¶¶ 15, 20]. As soon as she entered the patient doorway, Turk's wife went straight to Defendants to try to speak to them. [Doc. 58-2 at p. 64: l. 17 – l. 25]. She advised them that Turk was her husband[7] and of his injuries. *Id.* at p. 65: l. 1- l. 7. As soon as she entered the room, Officer Crytzer saw her wave at Turk and heard her saying "Jason, let's go." [Doc. 62 at p. 96: l. 20 – l. 25].

Already agitated from the issues regarding his medication, Turk grabbed the exam table he was sitting on "real tense," asked Defendants what they were doing in his patient room, and told them he did not feel comfortable with their presence. [Doc. 58-2 at p. 101: l. 15 – l. 24. At some point after doing so, he got up, walked over to his wife, and grabbed her arm. [Doc. 66 ¶ 16; Doc. 58-2 at p. 102: l. 6 – l. 8]. Officer Pagliaro then attempted to place Turk under arrest. [Doc. 66 ¶ 16].  Turk, in turn, grabbed Pagliaro's upper arm. *Id.* ¶ 17. He refused to release his grip when asked to do so. *Id.* During the scuffle that ensued, both men went to the ground and Officer Crytzer stepped in to assist Officer Pagliaro, pulling up on Turk's arm. *Id.* ¶¶ 18, 19. As they attempted to restrain Turk, Officer Pagliaro pepper-sprayed Turk in the face. *Id.* ¶ 20. Turk eventually released his grip on Pagliaro's arm. *Id.* ¶ 17. After being placed in handcuffs, the officers removed Turk from the patient room and took him to a holding cell in the PCA, where he was given some water by Officer Crytzer. *Id.* ¶¶ 21, 22. Turk was later taken to the ER at James Haley, by Officer Pagliaro, where his eyes were rinsed with saline. *Id.* ¶¶ 23, 24. Before he left the ER, Turk reported having no pain

---

[7] Officer Paglioro testified that they did not know who Ms. Turk was when she came walking through the door, but subsequently learned that she was Turk's wife. [Doc. 58-9 ¶¶ 19-20].

in his eyes, no blurred vision, and no other complaints, and any injuries he may have suffered as a result of this incident subsided over the next few weeks. *Id.* ¶¶ 25, 26.

*Disputed Material Facts*

While the parties agree that there was contact between Turk and his wife inside the patient room, there is some disagreement as to the nature of that contact. Defendants have provided evidence that Turk also grabbed his wife by the shoulder and pushed her into the wall. [Doc. 58-8 at p. 4]. To the contrary, Turk testified at his criminal trial that once he made his mind to terminate the encounter with Defendants, he walked over to his wife, grabbed her arm, and said "come on, honey, let's go." [Doc. 58-2 at p. 102: 1. 6 – 1. 9; p. 120: 1. 3 – 1. 4]. Ms. Turk also testified that he touched her and said "let's just go." *Id.* at p. 66: 1. 13 – 1. 14; p. 79: 1. 22 – 1. 23. Turk further testified that as soon as he touched his wife and made the statement, he was "instantaneously . . . hooked around the neck, put in a chokehold, off the ground, [and] slammed up against the wall." *Id.* at p. 102: 1. 6 – 1. 11. Again, Ms. Turk testified that this is how the events unfolded. *Id.* at p. 66: 1. 14 – 1. 17. At a deposition she gave for the criminal case, she testified that her husband did not batter her in the least and did not push her into the wall. [Doc. 62 at p. 202: 1. 16 – 1. 21(Ex. F)]. In fact, she testified that they both wanted to exit the room. *Id.* at 1. 16.

The parties also disagree as to whether Officer Pagliaro applied pepper spray to Turk one time or two times. In his Declaration, Officer Pagliaro stated that he employed a single short burst of pepper spray to Turk's face, after warning Turk to stop resisting and Turk continued doing so. [Doc. 58-9 ¶¶ 33, 34]. However, Turk and

his wife testified that Turk was pepper sprayed a second time after he had already been restrained and that the entire can of pepper spray was unloaded in his face. [Doc. 58-2 at p. 103: l. 12 – l. 25; p. 67: l. 19 – p. 68: l. 3].

*Procedural Development*

Turk filed this action against Defendants on October 9, 2018. [Doc. 1]. The Complaint asserts claims of False Arrest[8] and Excessive Force in violation of the Fourth Amendment against Defendants. *Id.* In his False Arrest claims, Counts I and III, Turk alleges that he was unlawfully seized by Defendants through their intentional confinement when they placed him under arrest and that the facts and circumstances within Defendant's knowledge would not cause a prudent officer to believe, under the circumstances shown, that Plaintiff had committed or was committing a criminal offense. *Id.* ¶¶ 24-27; 33-36. In Counts II and IV, Plaintiff alleges that Defendants gratuitously applied force that was excessive, thus making their actions unreasonable under the circumstances, and a deprivation of his right to be secure in his person against unreasonable and excessive force. *Id.* ¶¶ 30-31, 39-40. Additionally, Plaintiff specifically alleges that Officer Crytzer applied excessive force when he battered him and yanked his arm back and that Officer Pagliaro's excessive use of force involved putting him in a chokehold and spraying him with pepper spray. *Id.* ¶ 30, 39.

---

[8] The complaint alleges that Turk was charged with two counts of battery on a law enforcement officer, obstructing or opposing an officer with violence, and one count of domestic violence or battery. [Doc. 1 ¶ 21]. On June 9, 2016, a jury found him not guilty on all counts, except the domestic battery charge that was *nolle prossed* prior to trial. *Id.* ¶ 22.

Defendants have now moved for summary judgment on these claims[9] based on qualified immunity. [Doc. 58 ¶ 1]. They argue that because they were pursuing a job-related goal, as they were making an arrest and had arguable probable cause to believe Turk had committed a disorderly conduct in violation of 38 C.F.R. § 1.218(a)(5) and an assault in violation of 18 U.S.C. § 113(a)(5), Turk cannot establish a violation of his clearly established constitutional rights. *Id.* at pp. 1-2. They also argue that the majority of the acts that serve as the basis for Turk's excessive force claim have been held to be *de minimis* by the Eleventh Circuit, and that regardless, the force used was reasonable under the circumstances. *Id.* at p. 2.

Plaintiff contends, among other things, that summary judgment is inappropriate as the sworn statements surrounding the legality of his arrest are in dispute, as well as the sworn statements supporting probable cause for his arrest and the unlawful use of pepper spray. *Id.* at pp. 1-7. In reply, Defendants argue that the only disputed facts— whether Defendant's knocked and announced before entering Turk's patient room, whether Turk was free to leave after Defendants arrived at his door —are not material. [Doc. 67 at pp. 1-3]. Additionally, Defendants argue that other purported disputes are without merit as Turk's factual claims are unsupported. *Id.* at pp. 3-5. Defendants also argue that Turk has abandoned his claim as to the second burst of pepper spray by not responding to their argument and that there is no merit to Turk's reliance on *Yarusso*

---

[9] Defendants filed Counterclaims against Turk for battery [Doc. 33 at pp. 4-10], but have not moved for summary judgment as to those claims.

*v. State*, 942 So. 2d 939, 942 (Fla. 2d DCA 2006) as to Defendants' ability to detain

him or use force because he terminated a "consensual encounter." *Id.* at p. 6-8.

## II. LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is

no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law" after reviewing the "pleadings, the discovery and disclosure materials

on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2). The moving party bears the

initial burden of stating the basis for its motion and identifying those portions of the

record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256,

1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show

the court that there is "an absence of evidence to support the nonmoving party's case."

*Celotex*, 477 U.S. at 325, 106 S. Ct. 2548. "Only when that burden has been met does

the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604,

608 (11th Cir. 1991).

Generally, "the nonmoving party must set forth specific facts showing there is

a genuine issue for trial[,]" in order to survive summary judgment. *Johnson v. New*

*Destiny Christian Ctr. Church, Inc.*, No. 19-11070, 2020 WL 5289881, at *3 (11th Cir.

Sept. 4, 2020) (citing *Anderson*, 477 U.S. at 249-50). "[U]nsupported 'conclusory

allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th

Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to

create a genuine issue of material fact." *Johnson*, 2020 WL 5289881, at *3 (quoting *Anderson*, 477 U.S. at 252).

> Additionally, the Eleventh Circuit has instructed that:

>> When considering qualified immunity on a defendant's motion for summary judgment, we consider the record in the light most favorable to the plaintiff, eliminating all issues of fact. " 'By approaching the record in this way, the court has the plaintiff's best case before it.... [M]aterial issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity[.]' " *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005)). "[O]nce we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of the officer's actions is a pure question of law." *Penley*, 605 F.3d at 848–49 (internal quotations and emphasis omitted).

*Wate v. Kubler*, 839 F.3d 1012, 1019 (11th Cir. 2016).

## III.   DISCUSSION

The claims asserted in this lawsuit are unlawful arrest and excessive use of force, both in violation of the Fourth Amendment. Defendants assert that they are protected by qualified immunity. "Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right."[10] *Stephens*

---

[10] There is no issue here that Defendants were engaged in a discretionary act. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (explaining that in making this decision, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."); *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) ("Here, because

*v. DeGiovanni*, 852 F.3d 1298, 1314 (11th Cir. 2017) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)). When qualified immunity applies, it is 'an immunity from suit rather than a mere defense to liability and the doctrine shields all but the plainly incompetent or those who knowingly violate the law. *Crocker v. Beatty*, 995 F.3d 1232, 1239 (11th Cir. 2021).

In evaluating whether qualified immunity applies, a court determines (1) whether the facts alleged make out a violation of a constitutional right and (2) whether that right was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court has the discretion to address the two prongs of the analysis in either order. *See id.* at 236. Plaintiff has the burden of proof as to this determination. *See Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) ("To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law.") (citation omitted). Thus, to defeat Defendants' motion for summary judgment, Plaintiff must make both showings that Defendants alleged conduct was

---

Suszczynski was attempting to arrest or restrain Arango, Suszczynski was clearly engaged in a discretionary capacity, which means immunity could attach to his action."); *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) ("Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.").

unconstitutional and that the state of the law at the time was clearly established so as to provide "fair warning" to Defendants that such conduct was unconstitutional. *Wate*, 839 F.3d at 1019.

*Unlawful Arrest: Counts I and III*

Violation of Constitutional Right

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest constitutes a "seizure" within the meaning of the Fourth Amendment, and this Court "assess[es] the reasonableness of an arrest by the presence of probable cause for the arrest." *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016). The existence of probable cause bars a Fourth Amendment false-arrest claim. *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990). Even if actual probable cause did not exist, the claim may still be barred, by qualified immunity, due to the presence of arguable probable cause for the arrest. *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present."[11] *Id.* (citing *Durruthy v. Pastor,* 351 F.3d 1080, 1089 (11th Cir.2003)).

---

[11] This is a lower standard than the traditional probable cause standard. *See Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) ("A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.").

The evidence in the light most favorable to Turk is that Defendants received multiple alerts that the silent alarm was triggered at the PCA, Bravo Company, of the James Haley Veterans Affairs Hospital. When they responded to the Bravo Company, where the alerts originated, they heard shouting and cursing coming from one of the patient rooms. VA employees huddled together near the patient room from which the shouting was coming. One of the VA employees commented that Defendants needed to get into the room because something bad was going on. Defendants did not ask questions of the people they saw gathered outside. Once inside the room, they observed Turk sitting and the doctor standing near his computer. The doctor was not crying, shouting, screaming, yelling, or running out of the room and Defendants did not ask why he had pressed the alarm. Turk's wife entered the room sometime after, introduced herself to Defendants as Turk's wife, advised them of his injuries, and motioned to Turk that they should leave. Turk grabbed the exam table he was sitting on "real tense," asked Defendants what they were doing in his patient room and told them he did not feel comfortable with their presence. Eventually, Turk got up, walked over to his wife, grabbed her arm and said "come on, honey, let's go."

Having considered this evidence, the Court finds Defendants have established arguable probable cause to arrest Turk for disorderly conduct. It is unrefuted that multiple silent alarms were triggered from the Bravo Company and that Defendants heard shouting and cursing coming from a patient room—when they reported to Bravo Company—which they later determined was occupied by Turk. Defendants also observed a group of VA employees huddled together near the patient room from which

the shouting was coming. A reasonable officer could have believed that Turk's conduct constituted a violation of 38 C.F.R. § 1.218(a)(5). "The plain language of § 1.285(a)(5) prohibits conduct that: (1) 'creates loud or unusual noise'; (2) 'otherwise impedes or disrupts the performance of official duties by Government employees' or (3) involves 'the use of loud, abusive, or otherwise improper language.' " *United States v. Shepard*, 362 F. App'x 107, 112 (11th Cir. 2010) (quoting 38 C.F.R. § 1.218(a)(5)). It is undisputed that Turk's voice was raised, as he was agitated and cursing at his doctor. [Doc. 58-2 at p. 101: l. 6 – l. 17]. Likewise, it is undisputed that VA employees were not working, but rather huddled together near the patient room from which the shouting was coming. [Doc 58-9 ¶ 13]. A reasonable officer could have concluded that Plaintiff was the source of the shouting which disrupted the work of VA employees.

In *Shephard*, the appellate court found that there was sufficient evidence to support the magistrate's conclusion that Shepard's conduct was loud and boisterous, and that she impeded the duties of VA officers, as "Shepard did not contest that she was loud and upset, or that employees other than the police officers gathered near the lab." *Id.*; *see also United States v. Agront*, 773 F.3d 192, 199-200 (9th Cir. 2014) (holding that there was sufficient evidence to uphold a conviction where the defendant's altercation could be heard from 25 yards away and where VA workers were "drawn away from their ordinary tasks to monitor the situation"); *United States v. DeGarza*, 468 F. Supp. 3d 794, 798 (W.D. Tex. 2020) ("For a conviction under 38 C.F.R. § 1.218(a)(5), the government must prove that DeGarza engaged in conduct on VA property 'which create[d] loud or unusual noise,' 'impede[d] or disrupt[ed] the

14

performance of official duties by Government employees,' or involved 'the use of loud, abusive, or otherwise improper language.' The Court treats this standard as disjunctive: the government need not prove multiple or all of 38 C.F.R. § 1.218(a)(5)'s enumerated elements to obtain a conviction.") (citation omitted). As in *Shepard*, it is unrefuted that Defendant was loud and engaged in conduct that disrupted the performance of official duties by the VA employees.

Because Defendants had arguable probable cause to arrest Turk for disorderly conduct in violation of 38 C.F.R. § 1.218(a)(5), no constitutional violation occurred. They are shielded by qualified immunity from the claims for unlawful arrest. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010) ("If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply."). As Plaintiff has not shown that the facts make out a violation of a constitutional right, the Court need not consider whether the purported right was "clearly established" at the time of the alleged misconduct.[12]

*Excessive Force: Counts II and IV*

<u>Violation of Constitutional Right</u>

"Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S.

---

[12] Having concluded that Defendants had arguable probable cause to arrest Plaintiff for disorderly conduct, the Court need not consider whether arguable probable cause existed to arrest Plaintiff for assault under 18 U.S.C. § 113.

15

386, 396 (1989). "In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1314–15 (11th Cir. 2017) (quoting *Hadley*, 526 F.3d at 1329). Courts do not speculate as to what government officials subjectively thought but assess their actions for objective reasonableness under established constitutional law. *Id.* at 1315. As the Court explained in *Hinson v. Bias*, 927 F.3d 1103, 1117 (11th Cir. 2019):

> Factors we account for in making this assessment include (1) the severity of the crime; (2) whether the individual "poses an immediate threat to the safety of the officers or others[]"; (3) whether the individual actively resists or tries to evade arrest by flight[]; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury.

(citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S.  at 396–97. "[T]he application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (*italics* added).

The parties agree that when Officer Pagliaro attempted to place Turk under arrest, Turk grabbed Pagliaro's upper arm and refused to release his grip when asked, and at some point, both men went to the ground. [Doc. 66 ¶¶ 16-18]. During this encounter, Officer Crytzer pulled up on Turk's arm while assisting Officer Pagliaro to

restrain Turk. *Id.* ¶¶ 18, 19. At some point while Officer Pagliaro and Turk were on the ground, Officer Pagliaro pepper-sprayed Turk in the face, after which, Turk released his grip on Pagliaro's arm. *Id.* ¶¶ 17, 20. Turk and his wife testified that after Turk had been restrained, Officer Pagliaro pepper sprayed him a second time, unloading the entire can in his face.

Upon consideration of the evidence, in the light most favorable to Turk, the Court finds that qualified immunity offers protection to both Officer Crytzer and Officer Pagliaro for the excessive force, as alleged in the complaint. A reasonable person could find that Officer Crytzer used no more force than was necessary when he pulled on Turk's left arm and yanked it back.[13] Officer Crytzer was assisting Officer Pagliaro to restrain Turk and effect an arrest. Turk was actively resisting arrest, such that this force was reasonable and *de minimis.*

In *Nolin*, for example, the Court found more forceful conduct by the officers—grabbing Appellee, shoving him against a vehicle, pushing his knee into Appellee's back and Appellee's head against the van, among other things—"fell within the ambit of . . . *de mininis* force" and "sound[ed] little different from the minimal amount of force and injury involved in a typical arrest." 207 F.3d at 1258 n.4 (*italics* added). Likewise, in *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013), the officer grabbed

---

[13] Plaintiff also claims that Officer Crytzer put his knee in Turk's back while they were on the ground. [Doc 58-2 at p. 103: l. 8 – l. 17]. Although the complaint does not include an allegation that Officer Crytzer put his knee in Plaintiff's back, accepting Plaintiff's account of the facts as true, because Turk was actively resisting arrest, this force was reasonable and objectively necessary to gain control of Plaintiff.

the plaintiff by the arm, forced him to the ground, placed him in handcuffs, and searched him. The court found that the force used by the officer was no more severe than the force that it had described as *de minimis* and lawful in other cases. *See also Croom v. Balkwill*, 645 F.3d 1240, 1252–53 (11th Cir. 2011) (holding that the force used by law enforcement— pushing Croom to the ground from her squatting position and holding her there with a foot (or knee) in the back for up to ten minutes—was *de minimis)*. Based on the evidence in this case, a reasonable person would find that Officer Crytzer's use of force was *de minimis*.

As to Officer Pagliaro's use of force, the complaint alleges that Officer Pagliaro placed Turk in a chokehold and applied pepper spray to Turk.[14] Turk admitted resisting the attempt to restrain him and admitted that he grabbed Officer Pagliaro's arm and said, "I'm not letting go of your . . . arm until you let go of my throat, you're choking me to death, let go of my throat." [Doc. 58-2 at p. 102: l. 9 – l. 16; 103: l. 1 – l. 7]. He also admitted that before he was sprayed in the face, the officer warned him that if he did not let go of his arm, he would pepper spray him and he replied "I don't give a . . . what you do." *Id.* at p. 103: l. 11 – l. 16].

"[A]s a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent

---

[14] Although not alleged in the complaint, Plaintiff also claims that Officer Pagliaro threw him against a wall. [Doc. 58-8 at p. 10 (34): l. 5 – l. 15]. Officer Pagliaro denies throwing Plaintiff against a wall. Accepting Plaintiff's account of the facts as true, the force used by Officer Pagliaro was reasonable and objectively necessary to gain control of Plaintiff, who was resisting the attempt to restrain him.

physical injury." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (quotations omitted). As such, "[c]ourts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. *Id.* Taking all the facts in the light most favorable to Turk, a reasonable officer could have believed that the use of a chokehold and the application of pepper spray was necessary to restrain Turk and to secure compliance with orders. It is undisputed that Plaintiff was actively resisting Officer Pagliaro.

Turk also claims that Officer Pagliaro applied more pepper spray to Turk's face after he had been restrained and said it "seemed to be like unloading the entire can in his face." While the Court must accept this evidence as true, the complaint does not clearly allege two separate applications of pepper spray. [Doc. 1 ¶¶ 19, 39]. Rather, it sets forth a cause of action for excessive force arising from what appears to be one application of pepper spray, alleging only that "Officer Pagliaro sprayed Mr. Turk with Oleoresin Capiscum (OC) spray in Mr. Turk's face, emptying the canister in the process." [15] *Id.* ¶ 19. Because the complaint could be construed as asserting a claim for

---

[15]The Court notes that "in making the necessary preliminary determination of *what claims the plaintiff has actually raised* ... we are bound by the contents of the plaintiff's pleadings, even on summary judgment." *Mahoney v. Owens*, 818 F. App'x 894, 898 (11th Cir. 2020) (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005)). "Despite the 'liberal pleading standard for civil complaints,' plaintiffs may not 'raise new claims at the summary judgment stage.'" *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) (*Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314 (11th Cir.2004)).

excessive force arising from a second application of pepper spray by Officer Pagliaro, after Defendant was restrained, the Court will address this claim.

Even if the complaint could be construed as pleading a claim for excessive force against Officer Pagliaro based on a second application of pepper spray, Turk has failed to respond to Defendants' argument that the use of pepper spray did not violate clearly established law.  As Defendants point out in their reply, Plaintiff has abandoned any claim that this second use of pepper spray violated a clearly established right.[16] . [Doc. 67 at p. 6]. In moving for summary judgment, Defendant specifically argued that "[e]ven if a second application of pepper spray would have amounted to excessive force under the totality of these circumstances, it would not have violated law that was clearly established in October 2014." [Doc. 58 at p. 23]. Turk has presented no response to this argument. "[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, [w]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434

---

[16] "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), *cert. denied*, 141 S. Ct. 110 (2020). Only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court in a state can "clearly establish" the law, in a way which gives the officer fair notice that the conduct is unlawful. *Crocker*, 995 F.3d at 1240. Plaintiff can show a clearly established right by pointing to either case law with indistinguishable facts, a broad statement of principle within the Constitution, statute, or case law, or conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. *Id.*

(11th Cir. 2014) (citation omitted) (equation omitted). By not responding to Defendants' argument, Turk has abandoned the claim that the alleged second application of pepper spray violated his clearly established right at the time of the alleged misconduct. *See Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 954 n.1 (11th Cir. 2015) ("Cusick also raised claims for association discrimination under the ADA based upon his termination and for retaliation. However, he did not address these claims in his response to Yellowbook's motion for summary judgment, and the district court properly deemed them abandoned."); *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) ("The district court, therefore, properly treated as abandoned the Clarks' excessive force and state law claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment.").

Significantly, Turk's failure to address this issue constitutes a failure by Turk to discharge his burden to show that qualified immunity does not apply. *See Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020) ("[A] plaintiff must meet two requirements before qualified immunity may be rejected. First, that the officer in fact violated the plaintiff's rights and second that the violation contravened "clearly established statutory or constitutional rights of which a reasonable person would have known.") (citation omitted); *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

## IV.   Conclusion

In sum, the unlawful arrest claims against Defendants are barred by qualified immunity, as Defendants had arguable probable cause to arrest Turk for disorderly

conduct. The excessive force claims against Officer Crytzer and Officer Pagliaro are also barred by qualified immunity as Defendants have established that the force used was reasonably necessary to restrain Turk. Additionally, the force used was *de minimis*. As to the second application of pepper spray, Plaintiff has abandoned this claim. Accordingly, it is

**ORDERED AND ADJUDGED**:

1. Defendants' Motion for Summary Judgment [Doc. 58] is GRANTED.

2. A judgment in favor of Defendants Bryan Crytzer and Vincent Pagliaro and against Plaintiff Jason Turk, as to the claims in Plaintiff's complaint, will be entered at the conclusion of this litigation.

3. The Court will schedule a status conference to set a trial date as to the Defendants' counterclaims.

**DONE AND ORDERED** in Tampa, Florida on September 30, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any